64 March 7, 2024 No. 4

IN THE SUPREME COURT OF THE
STATE OF OREGON

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON REPRESENTED BY XL CATLIN
SYNDICATES 2003 AND 1209,
Liberty Syndicate 4472, and
Novae Syndicate 2007,
*Petitioners on Review,*

*v.*

TNA NA MANUFACTURING, INC.,
dba Foodesign Machinery & Systems, and
Food Design, Inc., an Oregon corporation,
*Respondents on Review.*

(CC 18CV15868) (CA A175864) (SC S070083)

En Banc

On review from the Court of Appeals.*

Argued and submitted November 9, 2023.

Sara Kobak, Schwabe, Williamson & Wyatt, P.C., Portland, argued the cause and filed the briefs for petitioners on review. Also on the briefs were William J. Ohle, and Aukjen T. Ingraham.

Dayna J. Christian, Immix Law Group PC, Portland, filed the brief for respondent on review TNA NA Manufacturing, Inc. Also on the briefs was Nicole McMillan.

Ashley L. Vulin, Davis Wright Tremaine LLP, Portland, argued the case and filed the brief for respondent on review Food Design, Inc. Also on the brief were P. Andrew McStay, Jr., and Meagan A. Himes.

JAMES, J.

_____
* Appeal from Clackamas County Circuit Court, Henry Breithaupt, Judge. 323 Or App 447, 523 P3d 690 (2022).

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**JAMES, J.**

The issue in this case is the specificity of contract language required to disclaim tort liability under Oregon law. SunOpta, Inc. (SunOpta), purchased food processing equipment from Food Design, Inc. (FDI), for use in its sunflower seed production.[1] Following a listeria outbreak that resulted in a recall costing SunOpta's insurer, Lloyd's London (Lloyd's), nearly 20 million dollars, Lloyd's brought claims for negligence and product liability against FDI and TNA NA Manufacturing, Inc. (TNA), FDI's successor in interest. On summary judgment, the trial court held that SunOpta had waived any action in tort through its purchase contract with FDI, and specifically looked to four provisions of that contract—sections 5, 7, 11, and 12—reasoning that, when read together, those provisions reflected a waiver of tort liability. The Court of Appeals affirmed the trial court, on narrower grounds, concluding that one provision, section 11, when viewed in the context of the contract as a whole, constituted a waiver of tort liability because the provision, "implicates liability beyond that arising under the contract." *Certain Underwriters v. TNA NA Manufacturing*, 323 Or App 447, 454, 523 P3d 690 (2022). Lloyd's petitioned for review, which we allowed.

We conclude that both the trial court and the Court of Appeals erred. Oregon law establishes that "a presumption will be indulged against an intention to contract for immunity from the consequence of one's own negligence." *Waterway Terminals v. P.S. Lord*, 242 Or 1, 19, 406 P2d 556 (1965). In considering whether that presumption has been overcome, "a contract will not be construed to provide immunity from the consequences of a party's own negligence unless that intention is clearly and unequivocally expressed." *Estey v. MacKenzie Engineering Inc.*, 324 Or 372, 376, 927 P2d 86 (1996) (quoting *Transamerica Ins. Co. v. U.S. Nat'l Bank*, 276 Or 945, 951, 558 P2d 328 (1976)). As we will explain, to waive tort liability, contract language must be clear and explicit; waiver will not simply be deduced from inference or implication. The text of the contract must show, clearly and

---

[1] Throughout this opinion, we refer to the parties by name and use the term "defendants" to refer collectively to FDI and TNA.

unambiguously, that the parties intended to disclaim actions outside of contract, *i.e.*, actions in tort. Generic text that purports to waive *all* liability, or *any* loss, will typically be insufficiently specific to overcome the presumption against the waiver of tort liability. Accordingly, the decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.[2]

## THE CONTRACT PROVISIONS

Before reciting the underlying facts, for ease of reference, we set forth the pertinent provisions of the contract between FDI (the seller) and SunOpta (the purchaser) on which the parties and the lower courts relied.

Section 5, entitled "WARRANTIES," states:

"Seller's warranties are limited as follows:

"There are no warranties which extend beyond the description on the face hereof.

"Seller warrants to the original Customer that the equipment is free from manufacturing defects. Seller agrees to repair or replace, F.O.B. any part of standard commercial manufactured items which are, within the warranty period of the manufacturer's item in question, found defective or otherwise unsatisfactory owing to faulty material or workmanship. The warranty shall not apply to any product which has been damaged by improper usage, accident, neglect, alteration or abuse. The liability of the manufacturer is limited solely to replacing the defective product. In no event shall the manufacturer be liable for special or consequential damages to any Purchaser, user or other person."

Section 7, entitled "MATERIALS AND WORKMAN-SHIP," provides, in relevant part:

"Purchaser agrees to defend and indemnify Seller against any loss, cost, damage or expense (including reasonable attorney's fees) resulting from any claims by Purchasers or by third parties (including Purchaser's employees) of

---

[2] At the Court of Appeals, plaintiffs raised an additional assignment of error, arguing that the trial court abused its discretion when it ordered plaintiffs to pay FDI attorney fees as a discovery sanction under ORCP 46 A(4). *Certain Underwriters*, 323 Or App at 449. The Court of Appeals affirmed the attorney fee award, *id.* at 457, and plaintiffs do not challenge that part of the decision before this court.

damage to property or injury to persons resulting from faulty installation or negligent operation of the equipment."

Section 11, entitled "DISCLAIMERS," states:

"There are no warranties, express or implied, including the warranty of merchantability and the warranty of fitness for a particular purpose extending beyond those set forth in [s]ection 5. Seller's liability shall be limited to the repair or replacement of any defective equipment and the parties agree that this shall be Purchaser's sole and exclusive remedy. Seller shall not be liable, in any event, for loss of profits, incidental or consequential damages or failure of the equipment to comply with any federal, state or local laws. Seller shall under no circumstances be liable for the cost of labor, raw materials used or lost in testing or experimental or production operations of any equipment sold, whether such testing, production or experimentation is done under the supervision of a representative of the Seller or of any employee or other representative of the Purchaser."

Section 12, entitled "DEFAULT, DAMAGES, AND REMEDIES," provides, in relevant part:

"In the event of default by either party, all rights and remedies shall be governed by the law of the State of Oregon and venue for any litigation shall be laid in the Circuit Court of Oregon for the County of Clackamas.

"Seller shall further not be liable for any consequential damages."

## BACKGROUND

Because the trial court granted defendants' motion for summary judgment, we recount the facts in the light most favorable to Lloyd's, the nonmoving party. ORCP 47 C.

SunOpta is a plant-based food company that experienced $20 million in damages after it issued a voluntary product recall in 2016 due to the discovery of the bacterium Listeria monocytogenes (listeria) in its processed sunflower seeds. The recalled sunflower seeds had been processed using equipment that SunOpta had purchased from FDI in 2012. Following the recall, Lloyd's paid SunOpta the insurance policy limit of $20 million to cover the company's

property losses, and SunOpta subrogated its claims related to FDI's potential tort liability to Lloyd's.

Lloyd's then sued defendants, FDI and its successor in interest, TNA, alleging tort claims for negligence and strict products liability under ORS 30.920. Lloyd's alleged that "the food contamination was caused by unreasonably dangerous design and manufacturing defects in FDI's cooling conveyor system that wrongly impeded access to fully inspect and sanitize all areas of the equipment." Lloyd's also alleged that the equipment had serious design and manufacturing flaws that improperly allowed water intrusion into hidden parts of the equipment that dangerously concealed product buildup and other conditions promoting the growth of listeria.

Defendants moved for summary judgment, arguing that the purchase contract for the cooling equipment barred Lloyd's tort action. That contract, a five-page document containing FDI's standard terms and conditions, had been included as part of FDI's sales proposal for the custom cooling conveyor system.[3] SunOpta executed that proposal without objecting to FDI's terms and conditions, and FDI then manufactured and delivered the equipment to SunOpta for approximately $32,000. Defendants argued that four provisions of that purchase contract—sections 5, 7, 11, and 12—reflected an "unmistakable mutual agreement for SunOpta, as an equipment buyer, to exculpate FDI from any tort liability for damages caused by FDI's own negligence or product defects."[4] In response, Lloyd's argued that those provisions of the sales contract did not satisfy the requirement that provisions limiting tort liability must be "clear and unequivocal."

The trial court granted summary judgment in favor of defendants. Relying on *American Wholesale Products v.*

---

[3] There was no evidence offered at summary judgment that FDI engaged in any kind of explanation or discussion with SunOpta about any of FDI's standard terms and conditions. There was also no evidence that FDI ever offered any kind of price concession, or otherwise bargained with SunOpta for a release of tort liability as a condition for the sale of FDI's food-processing equipment.

[4] Initially FDI did not claim that its standard terms and conditions included a waiver of tort liability. Rather, FDI asserted that the contractual terms at issue were intended to "disclaim[], in whole or in part, warranties" in the equipment.

*Allstate Ins. Co.*, 288 Or App 418, 406 P3d 163 (2017), the trial court read the relevant contract provisions together to "determine whether the liability allocation in the contract, including liability for defendants' own negligence or tort exposure, [was] clear and unequivocal." After noting that none of the provisions contradicted each other, the trial court stated that "nothing in the documents suggests that defendants' liability extends beyond repair or replacement." The court found that, "most importantly, no language in the agreement suggests that defendants have any responsibility for damage to person or property—that is[,] tort[-]type damages." The trial court then entered a general judgment, dismissing Lloyd's claims with prejudice.

Lloyd's appealed, and the Court of Appeals affirmed, although on different grounds than the trial court. The Court of Appeals "disagree[d] with the trial court's reasoning suggesting that sections 5, 7, and 12 shielded FDI from tort liability, because they all could be plausibly read as limitations to contract damages." *Certain Underwriters*, 323 Or App at 455. On the other hand, the Court of Appeals concluded that section 11 "[could not] be read in a way that restricts it to damages related to contract liability" and therefore "agree[d] with the trial court's ultimate conclusion that the text of the sales contract unambiguously limited FDI's tort liability." *Id*.

The court invoked *Estey* for the proposition that "[a] limitation of liability clause need not use the word 'negligence' in order to be effective against a negligence claim." *Id*. at 450 (quoting *Estey*, 324 Or at 378). Although the Court of Appeals disagreed with the trial court that sections 5, 7, and 12 immunized defendants from tort liability, it affirmed the trial court's grant of summary judgment on the grounds that section 11 of the sales contract "unambiguously disclaimed any liability in tort when viewed in the context of the contract as a whole." *Id*. at 453. The court stated that section 11, "[b]y disclaiming liability of the seller 'in any event,' in a section separate from the one titled '[WARRANTIES]' and with broad language as to the types of damages disclaimed, * * * the contract unambiguously expressed the parties' intent to immunize FDI from tort liability." *Id*.

The Court of Appeals based that decision on one of its own cases where it had held that "[a] contract that contains a broad reference to 'any liability' suggests that the parties intended for the provision to limit 'any liability' regardless of whether that liability arose in tort or contract." *Id*. at 453-54 (quoting *Kaste v. Land O'Lakes Purina Feed, LLC*, 284 Or App 233, 246, 392 P3d 805, *rev den*, 361 Or 671 (2017)). The court concluded that "[s]ection 11's statement that FDI 'shall not be liable, in any event' is substantially similar to a disclaimer of any liability." *Id*. at 454. The court further noted that the fact that the terms at issue were not included in the "WARRANTIES" provision but instead in the "DISCLAIMERS" provision indicated an intention for those disclaimers to apply beyond contract liability. *Id*. Finally, the Court of Appeals agreed with the trial court that the "disclaimer of any liability related to a violation of law necessarily implicates claims for negligence *per se*, which is a concept in tort." *Id*.

After concluding that the contract clearly and unambiguously immunized defendants from tort liability, the Court of Appeals proceeded to assess "the possibility of a harsh or inequitable result that would fall on one party if the other party was immunized from the consequences of its own negligence." *Id*. at 455 (quoting *American Wholesale Products*, 288 Or App at 423). The court concluded that

> "[t]he language of the contract indicates that the parties expected that issues involving the use of FDI's equipment would be remedied by either repairing or replacing the equipment. Nothing in the nature of the parties' relationship or bargaining power suggests that the parties reasonably held different expectations and, thus, it would not be harsh or inequitable to limit FDI's liability."

*Id*. at 456.

Lloyd's petitioned for review, which we allowed.

## ANALYSIS

Oregon law recognizes a "policy favoring the freedom to contract as one pleases *** unless there is some contravening policy which outweighs it." *Irish & Swartz Stores v. First Nat'l Bk.*, 220 Or 362, 378, 349 P2d 814

(1960). Accordingly, absent a public policy impediment,[5] so long as the parties have "expressed their intent with reasonable clarity, contractual immunity from a party's own negligence" can be "a matter for negotiation." *Commerce & Industry Ins. v. Orth*, 254 Or 226, 232, 458 P2d 926 (1969).

However, because "public policy favors the deterrence of negligent conduct," *Bagley v. Mt. Bachelor, Inc.*, 356 Or 543, 572, 340 P3d 27 (2014), the allocation of liability in tort is one area where public policy may outweigh the general freedom to contract. In light of the strong public interest in promoting the exercise of reasonable care, it has been the established rule in Oregon for over sixty years that "a presumption will be indulged *against* an intention to contract for immunity from the consequence of one's own negligence and that a contract will not be given that meaning unless so expressed in unequivocal language." *Waterway Terminals*, 242 Or at 19 (citing *So. Pac. Co. v. Morrison-Knudsen Co.*, 216 Or 398, 410, 338 P2d 665 (1959); *Glens Falls Indem. Co. v. Reimers*, 176 Or 47, 53, 155 P2d 923 (1945); *Southern Pac. Co. v. Layman*, 173 Or 275, 280, 145 P2d 295 (1944); and *U. S. Fid. & Guar. Co. v. Thomlinson Co.*, 172 Or 307, 324-25, 141 P2d 817 (1943)) (emphasis added).

In determining when a contract will overcome the presumption against the waiver of tort liability, exculpatory contracts are strictly construed to ensure that the releasing party did, in fact, knowingly bargain for the release of tort liability. *Commerce & Industry Ins.*, 254 Or at 231. "A contract will not be construed to provide immunity from consequences of a party's own negligence unless that intention is clearly and unequivocally expressed[.]" *Estey*, 324 Or at 376 (internal quotation marks and additional brackets omitted); *see also Restatement (Third) of Torts: Products Liability* § 2 comment d (1997) ("Courts normally construe exculpatory contracts strictly, finding that the plaintiff has

---

[5] For example, this court has held that "a clause in a contract for insurance purporting to indemnify the insured for damages recovered against him as a consequence of his intentional conduct in inflicting injury upon another is unenforceable by the insured on the ground that to permit recovery would be against public policy." *Isenhart v. General Casualty Co.*, 233 Or 49, 53, 377 P2d 26 (1962). As another example, ORS 30.140 voids, on public policy grounds, any provision in a construction agreement for indemnification against liability for personal-injury or property damage due to the indemnitee's sole negligence.

assumed a risk only if the terms of the agreement are clear and unequivocal.").

In considering whether a contract "clearly and unequivocally" waives tort liability, Oregon courts "consider both the language of the contract and the possibility of a harsh or inequitable result that would fall on [the releasing] party by immunizing the other party from the consequences of [their] own negligence." *Estey*, 342 Or at 376. The "heavy burden" to satisfy the "clear and unequivocal" standard means that the exculpatory contract must "put[ ] it beyond doubt," and the contract must make it crystal clear that the releasing party has absolved the other party from the consequences of the party's own negligence and product defects. *Layman*, 173 Or at 281 (citation and quotation marks omitted).

With those principles in mind, we turn to the contract at issue here. We readily conclude that sections 5, 7, and 12 fail to effect a waiver of tort liability.

We agree with the Court of Appeals that, with respect to section 5, "warranties" are "typically a contract concept." *Certain Underwriters*, 323 Or App at 451. The types of damages limited under section 5—special or consequential damages—are ordinarily types of damages under the Uniform Commercial Code (UCC), and they are naturally associated with contract disputes, not tort claims. *See* ORS 72.7150(2) (defining "consequential damages" as damages "resulting from the seller's breach"); *Parker v. Harris Pine Mills, Inc.*, 206 Or 187, 208, 291 P2d 709 (1955) (explaining that "'special damages' [are] those naturally but not necessarily resulting from the breach" of a contract (emphasis omitted)).

Defendants argue that, "[e]ven if the limitation of liability in [s]ection 5 relates only to breaches of warranty * * *, [that provision] uses * * * language showing the intent to limit liability even for harm to third parties." Even if that language shows an intent to limit liability for harm to third parties, that does not compel the conclusion that the parties were intending to cover third-party *tort* liability. Third-party liability can arise under contract as well. *Sisters of*

*St. Joseph v. Russell*, 318 Or 370, 374, 867 P2d 1377 (1994) (recognizing third party liability under contract; explaining that, "[a]s a general proposition, a third party's right to enforce a contractual promise in its favor depends on the intention of the parties to the contract").

For much the same reason, section 12 is insufficient to limit FDI's tort liability. Section 12—which covers default and limitations on liability for consequential damages—addresses contract requirements and remedies. Nothing in the text of section 12 reflects the clear and unambiguous language required to disclaim tort liability.

Nor does section 7 immunize FDI from all tort liability. That provision indemnifies FDI from some tort liability, but critically, only some. By its terms, section 7 shifted tort liability to SunOpta only for tort claims "resulting from faulty installation or negligent operation of the equipment." A reader could reasonably infer that *only* the referenced subset of tort claims is being addressed by that provision, and that, by negative implication, the contract does not waive other liability in tort.

We turn now to section 11, which formed the basis for the Court of Appeals' holding that tort liability had been contractually disclaimed in this case. For convenience, we set out the terms of section 11 again:

"DISCLAIMERS:

"There are no warranties, express or implied, including the warranty of merchantability and the warranty of fitness for a particular purpose extending beyond those set forth in [s]ection 5. Seller's liability shall be limited to the repair or replacement of any defective equipment and the parties agree that this shall be Purchaser's sole and exclusive remedy. Seller shall not be liable, in any event, for loss of profits, incidental or consequential damages or failure of the equipment to comply with any federal, state or local laws. Seller shall under no circumstances be liable for the cost of labor, raw materials used or lost in testing or experimental or production operations of any equipment sold, whether such testing, production or experimentation is done under the supervision of a representative of the Seller or of any employee or other representative of the Purchaser."

The Court of Appeals did not identify any specific language of tort disclaimer in section 11 but reasoned that the inclusion of the wording "'in any event,' in a section separate from the one titled '[WARRANTIES]' and with broad language as to the types of damages disclaimed" was sufficient. *Certain Underwriters*, 323 Or App at 453. In short, the Court of Appeals found the intent to waive tort liability through inference or implication, and through the use of broad language. We disagree with both of those approaches.

First, and most critically, nothing in section 11 plainly, directly, and unequivocally speaks to liability outside of that arising under contract. The words "in any event" do not clearly waive tort liability because the types of damages that are "disclaimed" in any event—loss of profits, incidental or consequential damages, or failure of the equipment to comply with federal, state, or local laws—can reasonably be understood to refer to damages other than those arising from the seller's own negligence. Because there is no clear, unequivocal waiver of that liability, any waiver can only be found by inference from the broad words used in section 11.

The problem with finding a waiver of tort liability by inference is that, at least in this case, there is not a single permissible inference. Section 11 could reasonably be read as a disclaimer of implied warranties other than section 5's express warranty. Much like section 5's remedy limitations for any breach of the express warranty, section 11 prescribes the exclusive remedy of repair or replacement of the equipment, and then it follows with an alternative remedy limitation in the event that the exclusive remedy does not apply—that is, it sets out the alternative remedy limitation providing that FDI is not liable "in any event" for "loss of profits, incidental or consequential damages or failure of the equipment to comply with any federal, state or local laws."

Additionally, it is not the case that the only permissible inference to be drawn from the location of the disclaimer, in a provision separate from one under the heading "WARRANTIES," is that the parties intended to disclaim tort liability. The requirements of the UCC provide a reason for commercial contracts for the sale of goods to have separate headings in contracts for warranties and warranty

disclaimers. The UCC requires that disclaimers of implied warranties of merchantability or fitness be "conspicuous." *See* ORS 72.3160 ("to exclude or modify the implied warranty of merchantability" or "implied warranty of fitness," exclusion must be "conspicuous"). Under the UCC, a "printed heading in capitals" is conspicuous, ORS 71.2010(10), and Oregon courts have previously held that warranty disclaimers are not sufficiently conspicuous if placed under a heading titled "warranty." *See Seibel v. Layne & Bowler, Inc.*, 56 Or App 387, 391, 641 P2d 668 (1981) (declining to give effect to warranty disclaimers because "[o]nly the paragraph headings, e.g., 'WARRANTY,' stand out, but such a heading suggests the making of warranties, not their exclusion").

Nor does the reference to "federal, state or local laws" require the inference that the parties intended to waive tort liability. Commercial contracts—especially in highly regulated industries such as food processing—often impose requirements for parties to comply with governing laws and regulatory standards, and compliance with such standards may be part of the basis of an implied warranty of fitness for a specific purpose. *See, e.g.*, *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F3d 971, 977 (9th Cir 2009) (analyzing how compliance with government regulations can be relevant to claims asserting breach of an implied warranty of fitness for a particular purpose); *Durrett v. Baxter Chrysler-Plymouth, Inc.*, 198 Neb 392, 395-96, 253 NW2d 37, 39 (1977) (explaining how compliance with government standards and regulations can be used to defend in cases involving implied or express warranties); *Clausing v. DeHart*, 83 Wash 2d 70, 73-75, 515 P2d 982, 984-85 (1973) (assessing a breach of warranty claim where a contract for the sale of securities in a nursing home warranted that sellers' operations were "maintained in accordance with all applicable government rules"). Contract damages—including consequential damages from regulatory penalties, manufacturing shutdowns, or other "down time" when equipment is out of service—also may result from failures to fulfill a contractual duty to comply with governing laws. *See, e.g.*, *NextSun Energy Littleton, LLC v. Acadia Ins. Co.*, 494 F Supp 3d 1, 4 (D Mass 2020) (upholding breach-of-contract claim to recover lost income during mandatory shutdown of operations from

governmental red-tag orders requiring the testing, inspection, and repair of equipment).

We reiterate that, to effect a waiver of liability in tort, a contract must be clear, explicit, unequivocal, and place the waiver beyond doubt. Arguments that seek to infer such an express waiver through inference or implication are unlikely to succeed. Our decision in *Estey*, 324 Or at 372, is illustrative. In that case, the plaintiff brought negligence and breach-of-contract claims against the defendant engineering firm after it provided a faulty inspection report. The contract between those parties set out an estimated contract sum of $200 and provided that "[t]he liability of [defendant] and the liability of its employees are limited to the Contract Sum." *Id*. at 374. On review, we found that the term lacked sufficient clarity to absolve the defendant of tort liability because the "plaintiff reasonably might have interpreted 'liability' to refer only to liability arising from breach of contract" and not to liability for negligence. *Id*. at 378-79. Because of the ambiguity in the limitation of liability, we could not "conclude that the parties 'clearly and unequivocally' intended a broader interpretation that would have required plaintiff to bear the risk of defendant's negligence." *Id*. at 379.

In reaching our conclusion in *Estey*, "we declin[ed] to hold that the word 'negligence' must expressly appear in order for an exculpatory or limitation of liability clause to be effective against a negligence claim." *Id*. at 378. That statement in *Estey* should not be read to obscure its core holding: The text of the contract must clearly and unambiguously show that the parties intended to disclaim liability outside of contract. Our decision in *K-Lines, Inc. v. Roberts Motor Co.*, 273 Or 242, 541 P2d 1378 (1975), illustrates effective contract language. In that case, the defendant manufacturer sought to avoid tort liability to a commercial purchaser based on a term in the sales contract providing that the manufacturer's liability was limited to repair or replacement of the product as the purchaser's "sole and exclusive remedy whether in contract, tort or otherwise, and [the defendant manufacturer] shall not be liable for injuries to persons or property." *Id*. at 245. In upholding the enforceability of that explicit

limitation on tort liability, we held that the provision was "not ambiguous or confusing" as a matter of law. *Id.* at 254.

We adhere to our statement in *Estey* that no magic words are, *per se*, required. However, to overcome the strong presumption against waiver of tort liability, the contract must make explicit that the liability being waived is outside of liability arising under contract. Perhaps it is possible to accomplish that goal without the use of the word "negligence," or "tort," and we do not entirely foreclose the possibility that an effective waiver could be constructed without those terms. But use of the terms negligence or tort may certainly prove helpful, and prudent and cautious contract drafters in Oregon might consider their use.

Finally, the Court of Appeals relied on its holding in *Kaste* for the proposition that "[a] contract that contains a broad reference to 'any liability' suggests that the parties intended for the provision to limit 'any liability' regardless of whether that liability arose in tort or contract." *Certain Underwriters*, 323 Or App at 453-54 (quoting *Kaste*, 284 Or App at 246). We disagree with that proposition. As we said in *Estey*, because the issue arose in the context of a contract, the "plaintiff reasonably might have interpreted 'liability' to refer only to liability from breach of contract" and not to liability for negligence. 324 Or at 378-79. Broad language may encompass tort liability in theory, but as a practical matter, in a contract, where the parties are naturally interpreting terms in the context of contractual obligations, broad language may obscure as much as it clarifies. Accordingly, we have rejected similar broad language disclaiming "any loss."

In *Layman*, we considered a contractual waiver written in very broad terms:

> "The agreement is on a printed form prepared by the railway company. The plaintiff is termed the 'Licensor' and the defendant the 'Licensee'. The clause thereof which plaintiff seeks to enforce reads: 'Licensee shall and hereby expressly agrees to indemnify and save harmless the Licensor and its lessor from and against any and all loss, damage, injury, cost and expense of every kind and nature, from any cause whatsoever, resulting directly or indirectly from the maintenance, presence or use of said crossing.'

173 Or at 276-77.

Despite the terms specifying "any and all loss *** from any cause whatsoever," we reasoned that such broad language was insufficient to meet the "clear and unequivocal" language requirements for contractual waiver of tort liability. In so reasoning, we began by noting that "[i]t is a firmly established rule that contracts of indemnity will not be construed to cover losses to the indemnitee caused by his own negligence unless such intention is expressed in clear and unequivocal terms." *Id*. We reiterated the strong policy rationale behind that strict rule:

> "'The liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation. No inference from words of general import can establish it.'"

*Id*. (quoting *Perry v. Payne*, 217 Pa 252, 255, 66 A 553, 554 (1907)).

We then considered the specific language of the indemnity clause at issue, noting that it was "undoubtedly broad and general enough to include loss caused solely by the plaintiff's negligence." *Id*. at 281. However, we surveyed the treatment of similar language by a range of courts and concluded that such "language has not deterred the courts from finding that no such meaning was intended by the parties." *Id*. (citing *Mynard v. Syracuse, B & NYR Co.*, 71 NY 180, 183 (1877) ("General words *from whatever cause arising* may well be satisfied by limiting them to such extraordinary liabilities as carriers are under without fault or negligence on their part. When general words may operate without including the negligence of the carrier or his servants, it will not be presumed that it was intended to include it." (Emphasis in original.)); *Manhattan Ry. Co. v. Cornell*, 7 NYS 557, 558 (Gen Term 1889), *aff'd*, 130 NY 637, 29 NE 151 (1891) ("For while the language of this part of the contract is very general, it cannot reasonably be so construed as to impose upon the contractors the obligation to protect the plaintiff against the carelessness or negligence of persons in its own employment.").

The treatment we observed in our survey of other jurisdictions in *Layman*, in 1944, continues to find support in other jurisdictions today. *See, e.g.*, *Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P3d 1260, 1265 (Colo App 2010) (reviewing appellate case law; holding that "any liability" language did not waive personal injury claim as no exculpatory provisions had previously been upheld in the absence of "some reference to waiving personal injury claims"); *Hyson v. White Water Mountain Resorts Of Connecticut, Inc.*, 265 Conn 636, 829 A2d 827 (2003) (concluding that a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly invokes negligence); *Wright v. Loon Mountain Recreation Corp.*, 140 NH 166, 169, 663 A2d 1340, 1342 (1995) (providing that the validity of a release turns on whether a reasonable person would have known of an exculpatory provision and stating that a reasonable person would understand the provision only if the language "'clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence'" (quoting *Barnes v. New Hampshire Karting Ass'n, Inc.*, 128 NH 102, 107, 509 A2d 151, 154 (1986))); *Sivaslian v. Rawlins*, 88 AD2d 703, 704, 451 NYS2d 307, 309 (1982) (concluding that provision that covered "any and all manner of actions" was insufficient to disclaim tort liability).

Accordingly, we continue to adhere to our analysis in *Layman*. Disclaimers written in generic broad language, such as "any liability" or "any loss" may be insufficiently specific to meet the standard of "clear and unequivocal" language sufficient to overcome the strong presumption against the waiver of tort liability.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.